Matter of Joshua XX. v Stefania YY. (2023 NY Slip Op 03743)

Matter of Joshua XX. v Stefania YY.

2023 NY Slip Op 03743

Decided on July 6, 2023

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:July 6, 2023

535639 
[*1]In the Matter of Joshua XX., Respondent,
v
Stefania YY., Appellant. (And Six Other Related Proceedings.)

Calendar Date:June 7, 2023

Before:Lynch, J.P., Clark, Pritzker, Reynolds Fitzgerald and Fisher, JJ. 

Miller Zeiderman LLP, White Plains (Adrienne Abraham of counsel), for appellant.
Law Office of Cappy Weiner, Kingston (Cappy Weiner of counsel), for respondent.
Betty J. Potenza, Milton, attorney for the child.

Lynch, J.P.
Appeal from an order of the Family Court of Ulster County (E. Danielle Jose-Decker, J.), entered June 7, 2022, which, among other things, granted petitioner's application, in a proceeding pursuant to Family Ct Act article 6, to modify a prior order of custody/visitation.
Petitioner (hereinafter the father) and respondent (hereinafter the mother) are the unmarried parents of a child (born in 2016). In 2017 and 2018, the parties filed a series of custody and family offense petitions against one another, which were litigated at a fact-finding hearing spanning the course of 14 days between July 2018 and June 2019. In a November 2019 decision, Family Court (Mizel, J.) found, as relevant here, that the father had committed the family offense of harassment in the second degree and/or criminal obstruction of breathing during an altercation between the parties in November 2017.[FN1] The court also awarded the mother sole legal and physical custody of the child, but found that the father's involvement with the child "should be maximized" and awarded him substantial parenting time. The court also awarded the mother final decision-making authority over education and medical decisions after advisement and consultation with the father, and directed the parties to refrain from disparaging one another in the child's presence. In awarding sole custody to the mother, the court recognized that a psychologist who completed a mental health evaluation of the parties expressed concern that the mother would alienate the child from the father if granted such relief, but had "a greater concern [about the father's violent] behavior toward [the mother]." This custody determination was memorialized into a written order entered in January 2020 (hereinafter the prior custody order).
In March 2020, the father filed the first of several modification petitions seeking sole legal and physical custody of the child. The petitions alleged, among other things, that the mother had "exposed [the child] to hazardous environments" with respect to the COVID-19 pandemic and was not providing the father with information about which of her residences the child was residing at while in her care. The father filed another modification petition in January 2021 in which he alleged, among other things, that the mother had "communicated to [the child] that [the father] was dangerous" and was not allowing him to have parenting time as required by the prior order.
Following fact-finding and Lincoln hearings, Family Court (Jose-Decker, J.), as relevant here, awarded sole legal and physical custody to the father, with parenting time to the mother "on the [second, third, and fourth] weeks of the month" from Sunday evening until Wednesday morning. The court also awarded the father final decision-making authority over the child's "education, medical, dental and psychological care and all other matters concerning the child's general welfare" after consultation with and advisement from the mother.[FN2] In support [*2]of transferring custody to the father, Family Court found, among other things, that the mother had used her award of custody as a "sword" to diminish the child's relationship with the father, had "repeatedly changed [the child's] dental providers and therapists," had exhibited questionable judgment with respect to her actions during the height of the COVID-19 pandemic, and was not fostering the child's relationship with the father. The court was also concerned about testimony that the mother was encouraging the child to call her domestic partner (hereinafter the boyfriend) "daddy," or, at the very least, was not taking steps to address this issue in the event the child was choosing to do so himself. Although the court did not discount the family offense finding against the father, it noted that the incident upon which the finding was based occurred five years prior and there was "no physical contact between the parties at present that suggest[ed] that a pattern of domestic violence has continued or [would] be perpetrated in the future." The court further noted that the father had an appropriate home environment for the child and had expressed his willingness to foster the child's relationship with the mother. The mother appeals.[FN3]
We affirm. "A party seeking to modify a prior order of custody must show that there has been a change in circumstances since the prior order and, then, if such a change occurred, that the best interests of the child would be served by a modification of that order" (Matter of David BB. v Danielle CC., ___ AD3d ___, ___, 188 NYS3d 790, 791 [3d Dept 2023]; see Matter of Jennifer VV. v Lawrence WW., 186 AD3d 946, 947-948 [3d Dept 2020]). Initially, the mother argues that Family Court erroneously concluded that there was a change in circumstances justifying a best interests review, emphasizing that the father filed the first of his modification petitions only two months after entry of the January 2020 custody order. We disagree and conclude that a change in circumstances was demonstrated by virtue of the testimony that the mother was using her award of custody to alienate the father from the child and had refused, on several occasions after January 2020, to respond to the father's reasonable requests for basic information about which of her homes in Ulster County, Dutchess County and Queens County the child would be staying at during her custodial time at the height of the COVID-19 pandemic (see Matter of Angela N. v Guy O., 144 AD3d 1343, 1345 [3d Dept 2016]; Matter of Sloand v Sloand, 30 AD3d 784, 786 [3d Dept 2006]). There was also evidence that the father — who had previously lived in the basement apartment of the paternal great-grandmother's home — had since moved to more suitable accommodations. As such, Family Court appropriately proceeded to a best interests review.
Turning to that analysis, several factors are considered in determining what custodial arrangement is in the child's best interests, including "the quality [*3]of the parents' respective home environments, the need for stability in the child's life, each parent's willingness to promote a positive relationship between the child and the other parent and each parent's past performance, relative fitness and ability to provide for the child's intellectual and emotional development and overall well-being" (Elizabeth B. v Scott B., 189 AD3d 1833, 1834 [3d Dept 2020] [internal quotation marks and citation omitted]; see Matter of Turner v Turner, 166 AD3d 1339, 1339 [3d Dept 2018]). "Inasmuch as Family Court is in a superior position to evaluate witness credibility, this Court will defer to its factual findings and only assess whether its determination is supported by a sound and substantial basis in the record" (Matter of David JJ. v Verna-Lee KK., 207 AD3d 841, 843 [3d Dept 2022] [internal quotation marks and citations omitted]; see Matter of Nicole J. v Joshua J., 206 AD3d 1186, 1187 [3d Dept 2022]).
We agree with Family Court that joint custody is still unfeasible in this case. Although joint custody is "an aspirational goal in every custody matter," it is abundantly clear that the parties are unable to effectively coparent (Matter of Christina E. v Clifford F., 200 AD3d 1111, 1112 [3d Dept 2021] [internal quotation marks and citations omitted]). Their only communication is through the "Talking Parents" phone app and their exchanges on this platform are fraught with animosity. As such, an award of sole custody was warranted.
As for the transfer of sole custody to the father, there is also a sound and substantial basis in the record to support Family Court's finding that this arrangement would be in the child's best interests. Initially, the family offense finding against the father must be addressed, as "the effect of domestic violence," when "proven by a preponderance of the evidence," must be considered in determining a child's best interests (Matter of Aimee T. v Ryan U., 173 AD3d 1377, 1379 [3d Dept 2019] [internal quotation marks and citations omitted]; see Domestic Relations Law § 240 [1] [a]). As set forth in the decision underlying the January 2020 custody order, Family Court (Mizel, J.) found — citing eyewitness testimony — that the father had committed the family offense of harassment in the second degree and/or criminal obstruction of breathing during an altercation in November 2017 wherein he choked and threatened to kill the mother. The child, who was 11 months old at that time, was present in a car during the altercation. During the fact-finding hearing on the underlying petitions, the father continued to deny having deliberately choked the mother and claimed that he was acting in self-defense. We are troubled by the father's continued denial and lack of remorse regarding this incident. Nevertheless, Family Court (Jose-Decker, J.) took this incident into account in concluding that a transfer of custody to the father was warranted, and, for the reasons that follow, we agree with its finding [*4]that this type of incident is unlikely to recur.
Since the November 2017 incident, the father has taken an anger management course,[FN4] which he found "informative," and has been treating with a therapist on a weekly basis for three years. He explained that he has made a deliberate — and, in our view, prudent — decision not to attend the custodial exchanges, notwithstanding that the order of protection entered against him allowed him to do so, in an effort to protect the child from further animosity between the parties. Instead, he relies on his parents to bring the child to the exchange location. Most significantly, the record does not indicate that the father presents a danger to the child. Rather, the paternal grandmother and great aunt expressed no concern about the father's behavior with the child, revealed that they had a wonderful relationship, and the great aunt confirmed that she had "[n]ever" observed the father act inappropriately with the child. The next-door neighbor echoed this sentiment, explaining that his son is friends with the child and that he had no concerns about the father supervising their playdates even despite the domestic violence incident. Accordingly, the domestic violence incident does not preclude an award of custody to the father in this case (see Matter of Aimee T. v Ryan U., 173 AD3d at 1379-1380; see generally Matter of Austin ZZ. v Aimee A., 191 AD3d 1134, 1138 [3d Dept 2021]).
Turning to the remainder of the inquiry, the testimony elicited at the fact-finding hearing supports Family Court's finding of parental alienation on the mother's part, demonstrating that she was encouraging the child to call the boyfriend "daddy." There was also evidence that the mother was displaying inappropriate behavior in front of the child during the custodial exchanges, including by recording the exchanges with her phone and explicitly highlighting to the child the fact that the father was not present for the exchanges in an apparent attempt to make the child feel bad. When the father asked the mother to stop doing so and explained that the child was comfortable with his parents doing the exchanges, the mother did not commit to stopping this behavior. There was also evidence that the child gets "very quiet and apprehensive" prior to the custodial exchanges, indicating that the mother's behavior was having a negative impact on him, as well as evidence demonstrating the mother's lack of insight into this issue.
Moreover, there was evidence from which Family Court could reasonably conclude that the mother was using her authority to set the exchange location to frustrate the father's parenting time, including testimony that the mother had changed the exchange location several times throughout the course of the proceedings, sometimes necessitating an 8-hour round trip drive to Queens County from the father's home in the hamlet of Phoenicia in the Town of Shandaken, Ulster County. There was also at least one occasion in which the mother [*5]changed the exchange location while the grandmother and the father were already in route to Queens, requiring them to turn around, and a circumstance in September 2021 in which the mother refused to switch the exchange location from New York City so that the father could take the child on a vacation to the Finger Lakes. We are mindful that the prior custody order provided that the child could be picked up from any of the mother's residences. However, her failure to accommodate reasonable requests from the father in this respect shows purposeful disregard for the father's time with the child.
The record also demonstrates that the father was more willing to encourage a parental relationship with the mother than the other way around. To that end, he recognized the importance of the child having a good relationship with both parents and maintained that he would make it a priority to facilitate contact between the child and the mother in the event custody was transferred. Although the mother testified that she had been successful in contacting the child while in the father's care only three times since January 2020, the father explained that he lacks cell phone service at his home and was committed to setting a fixed time for the child to have contact with the mother using WiFi. Indeed, his commitment to having the mother in the child's life is demonstrated by his request at the fact-finding hearing for a 50/50 split in custodial time. The mother, by contrast, expressed a desire for the father's parenting time to be supervised notwithstanding the lack of evidence that he posed a danger to the child's welfare. The mother was also less amenable to engage in family therapy than the father and, in response to a simple request from the father for information about whether she was enrolling the child in extracurricular activities, the mother was unwilling to give the father this basic information. Moreover, the mother attempted to portray the father as an absent parent when the evidence reveals otherwise, demonstrating her difficulty in placing the best interests of the child over her disdain for the father.
Upon reviewing the record and deferring to Family Court's credibility determinations, we conclude that there is a sound and substantial basis in the record to support the transfer of custody to the father. We are mindful that neither party is without fault for the acrimonious situation they have created and both have demonstrated immature behavior on the Talking Parents app. On this record, we have no concerns about the appropriateness of either of their home environments or ability to safely care for the child. However, there was credible evidence of parental alienation on the mother's part, she was less committed than the father to fostering a relationship between the child and the noncustodial parent, there was evidence that she was engaging in inappropriate behavior in the child's presence, causing him to become withdrawn, and there was evidence [*6]that she was inexplicably encouraging the child to call the boyfriend "daddy" (see Matter of Sue-Je F. v Alan G., 166 AD3d 1360, 1363 [3d Dept 2021]; Matter of Harlost v Carden, 124 AD3d 968, 968 [3d Dept 2015]). When considering the totality of the circumstances, there is no basis upon which to disturb Family Court's best interests finding. The mother's remaining contentions, to the extent not expressly addressed, have been considered and found lacking in merit.
Clark, Pritzker, Reynolds Fitzgerald and Fisher, JJ., concur.
ORDERED that the order is affirmed, without costs.

Footnotes

Footnote 1: An order of protection was issued in the mother's favor.

Footnote 2: Family Court also addressed violation petitions the parties had filed against one another, partially granting one of the father's petitions and denying the mother's petition. The mother's brief challenges only the propriety of the custody determination.

Footnote 3: Although not dispositive, we note that the attorney for the child (hereinafter AFC) supports the transfer of custody to the father. On April 19, 2023, this Court received a letter from the AFC asking us to take judicial notice of certain developments that have occurred since entry of the order on appeal. Attached to the letter is a December 2022 petition filed by the trial-level AFC in Family Court seeking to limit the mother's parenting time to "therapeutically supervised visits," and to preclude her from allowing the boyfriend to be alone with the child. A corresponding order to show cause, signed and entered on December 29, 2022, is attached to the AFC's letter, which directed the mother's visits with the child to be supervised pending further order of the court. The AFC on appeal represents that the mother's visits remained supervised until March 24, 2023, when an amended temporary order was issued reinstating the mother's unsupervised custodial time reduced from the order on appeal. Although the AFC has provided us with an amended temporary custody order purporting to corroborate this representation, the copy provided is unsigned. Nevertheless, we have obtained a signed copy of the amended temporary order and it confirms the AFC's contention that the mother's unsupervised parenting time has since been reinstated, but is slightly reduced from what she was afforded in the order on appeal. Although we take judicial notice of these developments, we express no opinion as to the veracity of the unproven allegations contained in the petition and do not factor them into the underlying analysis regarding the propriety of the underlying custody order (see Matter of Linda UU. v Dana VV., 212 AD3d 906, 907 [3d Dept 2023], lvs denied 39 NY3d 913 [2023]).

Footnote 4: We are mindful that the father was required to take an anger management course in connection with the family offense finding. In attempting to minimize the impact of this development, the mother focuses on the fact that this course was mandatory and emphasizes that the father did not submit any evidence to substantiate his claim that he had completed 9 of the 10 classes but failed to attend the last class because it was canceled at the onset of the pandemic. However, Family Court (Jose-Decker, J.) generally credited the father's testimony and there is nothing in the record that calls this testimony into question.